FILED
United States Court of Appeals
Tenth Circuit

July 14, 2026

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

KETONATURAL PET FOODS, INC.,
individually and on behalf of all others
similarly situated,

      Plaintiff - Appellant,

v.

HILL'S PET NUTRITION, INC., a
subsidiary of Colgate-Palmolive Co.,

      Defendant - Appellee.

No. 24-3185

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:24-CV-02046-KHV-ADM)**

_____

Thomas H. Burt (Kath M. McGuire, with him on the briefs), Wolf Haldenstein Adler
Freeman & Herz, LLP, New York, New York, for Plaintiff-Appellant.

Stanley J. Panikowski, DLA Piper LLP, San Diego, California (Melissa A. Reinckens,
DLA Piper LLP, San Diego, California, and David M. Horniak, DLA Piper LLP,
Washington, D.C., with him on the brief) for Defendant-Appellee.

_____

Before **TYMKOVICH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

    KetoNatural Pet Foods filed a class action against a competing pet food company,

Hill's Pet Nutrition, for false advertising under the Lanham Act.  Hill's produces pet food

1

that contains grain; KetoNatural's pet food is grain free.  KetoNatural alleged that Hill's and its partner veterinarians and non-profit organizations made false statements that grain-free pet food is linked to a higher risk of canine heart disease.  KetoNatural claimed that Hill's, the veterinarians, and the non-profits conspired to falsely disparage grain-free pet food to harm KetoNatural's sales.

The district court dismissed KetoNatural's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  It held that KetoNatural failed to plausibly allege two elements of a Lanham Act claim: (1) that the challenged statements were commercial speech, and (2) that the challenged statements were literally false.  We conclude that the district court erred in part.  KetoNatural plausibly alleged that some statements by Hill's were commercial speech that was false.  The challenged statements by the veterinarians and non-profits, however, were not commercial speech.

Exercising our jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** in part and **REVERSE** in part, and we **REMAND** for proceedings consistent with this opinion.

## I.    Background

### A.    *Factual Background*

Because we review the complaint at the motion-to-dismiss stage, we take the factual allegations from the complaint as true.  *See SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).

### 1.    *The Parties and Alleged Co-Conspirators*

Hill's is one of the largest and oldest American pet food companies. It primarily sells complete-diet pet food that contains grain as a major ingredient. Hill's and two other pet food companies dominate the market for "traditional" grain-containing complete-diet pet food in the United States. Before Hill's' sales were undermined by the non-traditional pet food boom, Hill's was the third-largest seller of complete-diet dog food in the United States. KetoNatural is a startup that produces and sells grain-free pet food. KetoNatural alleges that when Hill's' sales began to fall, it conspired with several veterinarians and two ostensibly independent non-profits to publicize the connection between grain-free diets and dilated cardiomyopathy, a deadly canine heart disease.[1]

As a marketing strategy, Hill's has forged relationships with veterinary professionals. It proclaims itself the "#1 Vet-Recommended Brand." App. 21. To ensure veterinary patronage, Hill's offers free continuing-education courses and literature to veterinarians and has partnered with veterinarian researchers to support its marketing. In return, Hill's provides partner veterinarians with financial support and promotes their work through its website. Hill's also funds research at various veterinary schools where partner veterinarians are located.

In addition to directly funding veterinarians, Hill's maintains connections to the larger veterinary world by funding two non-profits that promote animal welfare. Morris

---

[1] The parties' briefing and many of the challenged statements refer to the disease as "DCM," but for readability we refer to it as "canine heart disease."

Animal Foundation funds veterinary research projects and institutions, including the projects and institutions of the alleged co-conspirator veterinarians. And the Mark Morris Institute contributes to veterinary education by producing textbooks, continuing education courses, and course materials. Hill's' employees and directors have served on the boards of both organizations.

KetoNatural alleges that Hill's conspired with its partner veterinarians and non-profits to paint a false picture of the dangers of KetoNatural's grain-free pet food.

### 2.    *The Alleged False-Statements Campaign*

As the grain-free pet food market gained popularity in the United States in the early 2010's, Hill's' market share declined, falling by more than 20% from 2014 to 2017. Though Hill's had long been the third-largest seller of complete-diet dog food in the United States, it fell to fourth behind a non-traditional dog food company. Recognizing its financial decline, Hill's embarked on a marketing strategy to disparage all non-traditional pet foods. It did this by fabricating a link between non-traditional pet food—called "BEG" pet food—and canine heart disease. BEG pet foods are those that are produced by small "boutique" companies, made from "exotic" ingredients, or are "grain-free."[2]

---

[2] According to the complaint, the BEG category is not unified by a single nutritional quality. App. 64. Boutique refers to pet food produced by a company smaller than the three well-established grain-containing pet food companies, even if that pet food has the same ingredients as Hill's. Exotic refers to pet food containing various ingredients that apply to every pet food save the three traditional grain-containing ones. Grain-free is self-explanatory. These three categories cover the

KetoNatural alleges that because of Hill's' targeted marketing campaign, Hill's' revenues grew by more than 50% from 2018 to 2022. Sales in the BEG industry, by contrast, suffered the opposite fate. In 2018, for example, BEG sales were growing at over 8% annually. But after the alleged disparagement campaign, BEG sales reversed and began to decrease by nearly 6% per year. KetoNatural alleges that its pet food sales suffered a similar fate.[3]

KetoNatural alleges that Hill's and its co-conspirators embarked on a campaign to violate the Lanham Act by making, orchestrating, and publicizing a number of false statements that disparaged BEG pet food like KetoNatural's. The statements generally fall into the categories below:

*First*, Hill's' webpages and links. Hill's claimed on its website that BEG diets were connected to canine heart disease and linked to veterinarians' blog posts stating the same.

*Second*, Hill's' veterinary education materials. Hill's offered educational materials and continuing education courses to veterinarians on its website that similarly asserted the false link.

---

breadth of the complete-diet pet food industry save that of Hill's and the two other traditional pet food companies.

[3] KetoNatural did not provide revenue information in its complaint for this period, but it asserts that its injuries are typical of the BEG industry. It intends to prove the damages caused by Hill's' marketing campaign at trial.

*Third*, the veterinarians' public statements. The veterinarians reported to the Food and Drug Administration a spike in canine heart disease in dogs eating BEG diets, and the FDA announced an investigation into a potential link between the two. The veterinarians publicized this FDA investigation into a link through several media appearances. Because of the veterinarians' efforts, the FDA investigation made a splash.[4] But after four years of investigation, the FDA never established a correlation between BEG diets and an increased risk of canine heart disease.

*Fourth*, the veterinarians' scientific publications. The veterinarians published studies in scientific journals with misleading titles and abstracts, which led readers to believe that BEG diets were linked to the disease.

*Fifth*, the veterinarians' blogs. The veterinarians mischaracterized those same studies' findings in blog posts, again misleading readers to believe that BEG diets were linked to canine heart disease.

*Sixth*, a Facebook page and associated website promoting traditional pet food. Hill's and the veterinarians moderated and controlled a Facebook group on diet-associated pet diseases that had over 129,000 members. The moderators published statements affirming the link between BEG diets and canine heart disease and deleted all comments contradicting the correlation. The moderators also created a public website to

---

[4] KetoNatural also believes that the veterinarians submitted cherry-picked information to the FDA. For purposes of its Lanham Act claim, however, KetoNatural challenges the veterinarians' speech following the FDA announcement, not the prior communications prompting the FDA investigation.

spread the notion that BEG diets were correlated with canine heart disease and suggesting donations to the institutions run by co-conspirator veterinarians.

*Seventh*, statements by the non-profits. Both the Morris Animal Foundation and the Mark Morris Institute propagated misstatements by funding research of the veterinarians, publishing the work on their websites, and disseminating the false information to the broader veterinary community through educational initiatives.

*Finally*, independent veterinarians' statements. Indoctrinated by the conspiracy's educational efforts, these unaffiliated veterinarians informed pet owners about the link, causing them to stop purchasing BEG pet food.

### B.    *Procedural Background*

KetoNatural filed two claims against Hill's: (1) false advertising in violation of the Lanham Act, and (2) conspiring to violate the Act in violation of Kansas's civil conspiracy law. KetoNatural claims that Hill's is liable not only for its own Lanham Act violations, but that Hill's is also vicariously liable for its co-conspirators' false statements through the alleged civil conspiracy.

The district court dismissed KetoNatural's Lanham Act claim under Rule 12 for two independent reasons: it concluded that (1) the challenged statements were not commercial speech, and that (2) they were not literally false.[5] As to the first reason, the court concluded that academic articles categorically cannot be commercial speech

---

[5] The district court passed on deciding whether Rule 9(b) or 12(b)(6) applies to Lanham Act claims because it concluded that KetoNatural failed the lower standard supplied by Rule 12.

because they are akin to opinions, which are protected speech. The court found that the remaining categories of speech were not commercial speech because they did not propose a transaction to purchase Hill's' products.

Second, the district court held that KetoNatural did not allege that the challenged statements were literally false under the Lanham Act. It found fatal that KetoNatural did not allege facts proving the *negative*—that BEG diets are *not* linked to canine heart disease. The district court considered but rejected applying an inference that would permit KetoNatural to show that the challenged "science proves this link" claims were literally false by showing that no science *affirmatively* proved the link.

Because the district court dismissed KetoNatural's Lanham Act claim, it also dismissed the derivative civil conspiracy claim. Kansas civil conspiracy requires a predicate independent wrong, and KetoNatural had alleged no wrong besides the failed Lanham Act claim.

## II.    Discussion

KetoNatural contends that the district court erred in dismissing its Lanham Act and civil conspiracy claims against Hill's. It claims it plausibly alleged commercial speech on the part of Hill's and its co-conspirators, and also plausibly alleged literally false speech.

### A.    Legal Framework

We review a district court's grant of a motion to dismiss for failure to state a claim de novo. *McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1143 (10th Cir. 2023). To

survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain 'only enough facts to state a claim to relief that is plausible on its face.'" *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1207 (10th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (citation modified).

The Lanham Act prohibits "false or misleading representation[s] of fact" made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1). The provision states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.*

To state a claim, KetoNatural must show "(1) that [Hill's] made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause

9

confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff." *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002) (citation modified).

In turn, to qualify as a representation made in "commercial advertising or promotion," we apply a four-part inquiry. The false representation must be: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . . [and it] (4) must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000) (citation modified).[6] Whether a representation is "commercial speech" under the Lanham Act

---

[6] Several other circuits have adopted this four-part test for "commercial advertising or promotion" in full. *See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012). Others have adopted it in part. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57–58 (2d Cir. 2002) (adopting elements one, three, and four). For a fuller discussion of our sister circuits' case law on this test, see generally 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:71 (5th ed., June 2026 update).

Both the Second and Seventh Circuits have noted that the Lanham Act's statutory inquiry applies separately to "advertising" and "promotion." *Fashion Boutique*, 314 F.3d at 57 ("Although advertising is generally understood to consist of widespread communication through print or broadcast media, 'promotion' may take other forms of publicity used in the relevant industry, such as displays at trade shows and sales presentations to buyers."); *Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514,

is informed by Supreme Court First Amendment commercial speech jurisprudence, *id.* at 1274, since non-commercial speech on matters of public concern, even false speech, is protected. *See United States v. Alvarez*, 567 U.S. 709, 722 (2012) ("reject[ing] the notion that false speech should be in a general category that is presumptively unprotected" by the First Amendment).

The First Amendment differentiates between "core" and non-core commercial speech. Core commercial speech is "speech which does 'no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). In contrast, non-core commercial speech does more than merely propose a commercial transaction; it broadly promotes or advertises a product or good. *See* Robert Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. Rev. 1, 5 (2000) ("[S]ometimes advertising is deemed to be public discourse rather than commercial speech, and sometimes expression that would not ordinarily be regarded as advertising is included within the category of commercial speech. The boundaries of the category are thus quite blurred.").

The Court has identified three characteristics that "strong[ly] support" identifying a statement or claim as non-core commercial speech:

---

522 (7th Cir. 2012) ("If 'advertising or promotion' just meant 'advertising,' then 'promotion' would do no work in the statute. . . . [T]here are industries in which promotion—a systematic communicative endeavor to persuade possible customers to buy the seller's product—takes a form other than publishing or broadcasting.").

(1) it is an advertisement,

(2) it references a specific product, and

(3) it is made with economic motivation.

*Bolger*, 463 U.S. at 66–67.  None of these characteristics alone compel the

conclusion that the speech is commercial.[7]

Following *Bolger*'s example, courts have taken a holistic and functional

approach to recognizing non-core commercial speech.  Courts have recognized that

even product disparagement can be actionable non-core commercial speech.  *See,*

*e.g.*, *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950–51 (11th Cir. 2017)

(applying the *Bolger* test to defendant's disparaging articles to determine whether the

---

[7] In *Bolger*, a contraceptives manufacturer began a marketing campaign issuing mass mailings to members of the public.  It mailed flyers and pamphlets promoting its products and others discussing the desirability and availability of contraception in general.  The Supreme Court determined that each of the flyers and pamphlets was commercial speech, even those that promoted contraception in the abstract.  Taking the parties' concession that the mailed materials were *advertisements*, the Court concluded that the flyers and pamphlets sufficiently *referenced a specific product* because they promoted the manufacturer's contraception, even if by subtle marketing.  *Id.* at 66 & n. 13.  In other words, the Court determined that specific product discussion was not needed to promote the manufacturer's products—because the manufacturer dominated the contraceptive market, even a pamphlet discussing condoms without any specific reference to the manufacturer's product, and only a footnote reference to the manufacturer, met the core of this characteristic.  Lastly, the Court recognized that the manufacturer had *economic motivation* to mail the flyers and pamphlets.  While no characteristic alone supported treating these materials as commercial speech, their combination did.  And the fact that the materials discussed issues of public importance, such as venereal disease and family planning, did not change the Court's conclusion that the materials were commercial speech.  The Court recognized that commercial speech does not become "entitled to the constitutional protection afforded noncommercial speech" by merely "link[ing] a product to a current public debate."  *Id.* at 68 (citation modified).

12

speech was commercial for purposes of a Lanham Act claim); *Podiatrist Ass'n, Inc.*, 332 F.3d at 19–20 (discussing and applying commercial speech doctrine within a Lanham Act claim to alleged disparaging remarks by insurance representatives discrediting podiatrists).  Thus, for example, we have held that a message to distributors disseminated over voicemail that maligned the president of a competitor company as a "Satanist" was commercial speech.  We did so because the message was sent with economic motive and functionally promoted the competing company's products.  *See Haugen*, 222 F.3d at 1275.  Although the disparaging speech did not present "a classic advertising campaign," it functioned like one.  *See id.* at 1274–75 (citation modified); *see also Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (determining that the same disparaging Satanist speech at issue in *Haugen*, though not obviously an advertisement, could nevertheless be commercial speech if made with economic motivation—because the character of the speaker's motivation determined whether the court should consider the speech an advertisement); *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (recognizing that a nutritional supplement catalog that rigged ratings constituted commercial speech because the owner did so primarily motivated by compensation from the favored company).  These cases illuminate the core of a holistic approach to identifying commercial speech.  While a speaker's economic motivation for speech does not necessarily transform the speech

13

into commercial speech, it informs whether that speech was intended to be an advertisement and promote certain products.[8]

In addition to the requirement of commercial speech, the Lanham Act requires that the statements be false. To demonstrate that a representation is false or misleading, the plaintiff must show that the representation is "literally false, either on its face or by necessary implication," or that it is "literally true but likely to mislead or confuse customers."[9] *Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1235 (10th Cir. 2023) (quoting *Zoller Lab'ys, LLC. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004)). To be literally false, a statement must be unambiguous. *I Dig Texas, LLC v. Creager*, 98 F.4th 998, 1009 (10th Cir. 2024). A literally false "claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Zoller Lab'ys*, 111 F. App'x at 982–83 (quoting *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 35 (1st Cir. 2000)).

In cases involving commercial speech that touches on scientific or expert opinion, courts have added a twist in considering falsity. When a statement claims it is backed up by scientific data, courts can consider whether the underlying data in

---

[8] The Court has made clear that economic motivation cannot alone transform speech into commercial speech. *Bolger*, 463 U.S. at 67 (collecting cases). Otherwise, newspapers, magazines, and books offered for sale could be considered commercial publications.

[9] KetoNatural waived the "true but misleading" theory of false speech. *See* Oral Argument at 4:56 (conceding failure to preserve).

fact supports the assertion. For such a statement to be false, a plaintiff must show that the scientific tests "d[o] not establish the proposition for which they were cited," or that they "were not sufficiently reliable to permit [the] conclusion" for which they were cited. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992); *see also Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1309 (11th Cir. 2010). Courts call this concept the "establishment claim doctrine" because the truth of the statement is claimed to have been *established* by the underlying scientific evidence.[10]

* * *

With this legal framework in mind, we turn to KetoNatural's commercial speech allegations.

**B.    Application**

We start by reviewing the allegations against Hill's and then turn to those against the veterinarians and non-profits.

---

[10] The Second, Third, Fourth, Seventh, Eighth, Ninth, Eleventh, and D.C. Circuits have all adopted or applied some form of the establishment claim doctrine. *See*, *e.g.*, *Castrol, Inc.*, 977 F.2d at 63; *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590 (3d Cir. 2002); *C.B. Fleet Co.*, *Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 435 (4th Cir. 1997); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994); *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514–15 (8th Cir. 1996); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Osmose, Inc.*, 612 F.3d at 1309; *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964–65 & n.7 (D.C. Cir. 1990).

### 1. *Hill's' Speech*

KetoNatural alleges that Hill's violated the Lanham Act by disparaging its products (1) in Hill's' webpages and linked webpages, and (2) through Hill's' veterinary education materials on its website. Hill's argues that these challenged statements are not commercial speech because they do not share two of the *Bolger* characteristics for non-core commercial speech: they are not advertisements and do not reference a specific product.

### a. *Hill's' Webpages and Links*

KetoNatural alleges that among others, the following statements and links on Hill's' website constitute commercial speech.

- In a webpage discussing protein in dog diets, Hill's wrote that "trends" such as "grain-free, raw, vegan, farm-to-table, plant-based, or homemade" dog foods can "pose health risks for dogs." App. 78.

- On that same webpage, "health risks for dogs" hyperlinked to an alleged co-conspirator veterinarian's blog article titled, "*A Broken Heart: Risk of Heart Disease in Boutique or Grain-Free Diets and Exotic Ingredients*," and the article contained numerous allegations of a link between canine heart disease and BEG diets. App. 71, 78. For example, the article asserted that "[w]hat seems to be consistent is that [DCM] does appear to be more likely to occur in dogs eating boutique, grain-free, or exotic-ingredient diets." App. 73.

- And a separate Hill's webpage titled "*Cardiomyopathy in Dogs: What You Need to Know*," linked to a page where another alleged co-conspirator veterinarian states that "[t]hese boutique diets tend to come from smaller manufacturers that may not have the nutritional expertise and resources to ensure quality control that the larger, established companies have . . . . We are not yet seeing DCM in smaller dogs fed grain-free diets produced by large-scale manufacturers." App. 104–05.

16

We begin with the first *Bolger* characteristic—whether these statements are advertisements. We readily concede that they do not present themselves as a "classic advertising campaign," but they need not do so to promote Hill's products. *Haugen*, 222 F.3d at 1274. As some circuits have noted, economic motivation to sell products informs whether the speaker intended the speech to function as an advertisement. *See, e.g.*, *Ariix*, 985 F.3d at 1116 ("While such social media posts may not have the indicia of a traditional advertisement, there can be little doubt that these paid posts are in fact advertisements."); *Amway*, 242 F.3d at 552 ("Certainly the repetition of the rumor via [a telephone messaging system] was not an advertisement in the classic sense, but whether it could be considered as a negative advertisement against P&G seems to depend on . . . whether the speaker had an economic motivation for the speech.").[11]

Next, the second *Bolger* characteristic—whether the statements promote a specific product. Although these statements do not promote a particular Hill's product, they plausibly promote Hill's' grain-based pet food as safer for dogs, even without naming Hill's explicitly. As *Bolger* recognized, "a company with sufficient control of the market for a product may be able to promote the product without

---

[11] In any event, we need not find that these statements are advertisements to find that they still constitute commercial speech. We apply the *Bolger* characteristics holistically and have found that when the other two characteristics are present, the plaintiff has plausibly alleged commercial speech. *Haugen*, 222 F.3d at 1275.

17

reference to its own brand names." *Bolger*, 463 U.S. at 66 n.13. As in *Bolger*, Hill's maintains a coveted spot in this market. It is one of three companies that dominate the traditional pet food market in the United States. As a result, its disparagement of non-traditional, BEG pet food is a tacit promotion of its own pet food. And the fact that the statements promote Hill's' brand, rather than a specific *product*, does not remove their commercial character. *See, e.g.*, *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service."). *Bolger* itself recognized that brand promotion met this second characteristic when analyzing the informational contraception pamphlet issued by the leader in the contraceptive market.

Finally, as to the third *Bolger* characteristic—these statements were made with economic motivation to bolster Hill's' sales. According to the complaint, Hill's was rapidly losing market share to BEG-producing pet food companies. It had even slid to fourth in the complete-diet pet food market. And so, working with veterinarians and its own non-profits, it orchestrated a media campaign to turn customers back towards the big three "traditional" pet food companies. Hill's appeared to succeed, swiftly regaining market share. Taking the complaint's allegations as true, Hill's had clear economic motivation to make statements like these to return the market to traditional pet food companies. *Cf. Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120–21 (8th Cir. 1999) (concluding that the speaker's financial concerns

18

associated with a direct competitor's product evidenced the speech's economic motivation).

The same is true of the statements linked from Hill's' website. For example, Hill's' webpage stated that "trends" such as "grain-free, raw, vegan, farm-to-table, plant-based, or homemade" dog foods can "pose health risks for dogs," and hyperlinked "health risks for dogs" to a veterinarian's blog bolstering the alleged false link. App. 78. These and similar hyperlinks are plausibly commercial speech because by their presence on Hill's' website, they promote Hill's as a non-BEG alternative—a safer dog food. Hill's contends that any disparaging statements on the linked webpages are not commercial speech because they make no mention of Hill's and its products. And analyzed alone, the speech on the linked webpages is not. But hyperlinks to the relevant webpages are embedded in Hill's' website. Because of the hyperlinks' location and the fact that the linked pages disparage BEG dog foods, the linked webpages can plausibly be understood to promote Hill's' products. *See Tobinick*, 848 F.3d at 951 (explaining that "a restaurant or movie review or a product report on its own is not commercial speech under the Lanham Act . . . but can be transformed into commercial speech when, for instance, a restaurant posts the review in its window" (citation modified)).

KetoNatural has plausibly alleged that some statements and links on Hill's' webpages are commercial speech.

KetoNatural has also plausibly alleged that these statements are literally false. As we discussed above, the establishment claim doctrine applies when a plaintiff

19

challenges as literally false commercial speech's explicit or implicit reliance on scientific data to prove the truth of its claims. To prevail on these claims, a plaintiff must show that the scientific studies relied on either are not sufficiently reliable to prove their own conclusions or that the scientific studies do not establish the assertion for which they are cited. *Castrol, Inc.*, 977 F.2d at 63. We find that KetoNatural has plausibly alleged that the supporting scientific studies do not establish the statements' assertions.

Take the following example from above: a link titled "health risks for dogs" on Hill's' webpage that leads to the following on a veterinarian's blog: "[w]hat seems to be consistent is that [DCM] does appear to be more likely to occur in dogs eating boutique, grain-free, or exotic-ingredient diets." App. at 73, 78. This statement permits an establishment claim because it establishes a correlation between the diet and the disease by implicitly relying on some independent, objectively verifiable study showing consistent and higher rates of canine heart disease in BEG-eating dogs. And it is plausibly literally false because KetoNatural alleges that no study supports the correlation.[12]

---

[12] KetoNatural's complaint alleges that the relevant studies Hill's and the veterinarians reference, or may have relied on, suffer from one of at least four infirmities. These structural infirmities led Hill's to misrepresent the findings of the studies. *See* App. 90–92. KetoNatural explains how these studies do not show (1) that dogs with canine heart disease who ate BEG diets experienced better clinical outcomes with a diet change, because there were uncontrolled variables in the study; (2) that dogs with canine heart disease who ate BEG diets lived longer with a diet change away from BEG foods, when the cited studies do not directly compare life expectancy for dogs who switched from BEG diets to traditional pet foods and those

In short, KetoNatural has successfully alleged that this category of Hill's'

statements plausibly includes literally false commercial speech.

### b.    Hill's Veterinary Education Materials

Likewise, KetoNatural has plausibly alleged that at least some of the

veterinary education materials on Hill's' website constitute commercial speech.

Hill's' website has a section intended for veterinarians and veterinarian technicians

that requires account creation.  The complaint alleges:

- The password-protected section offers a 90-minute presentation on "*Navigating the Pet Food Aisle*."  One slide titled, "Premium Priced . . . may not be premium quality," states: "Diet-induced cardiomyopathy reported since 2017 in dogs fed 'premium' grain-free and boutique foods." App. 105–06.

- In a separate presentation funded by Hill's and posted for veterinarians, a summary about the evidence around canine heart disease in dogs stated, "[b]y now, most veterinary professionals understand that there's a link between BEG diets and atypical dog breeds developing DCM."  App. 106–08.

In context, the posted materials plausibly (1) function as an advertisement by

disparaging BEG diets, (2) promote Hill's' brand, and (3) were made with economic

motivation.  This conclusion is strengthened because KetoNatural has alleged that

---

who continued to eat BEG diets; (3) that BEG diets are linked to canine heart disease, when BEG diets are linked only with subclinical symptoms that are not proven to be correlated with canine heart disease; and (4) that BEG diets are correlated with or have caused the recent canine heart disease spike, when no incidence studies have been performed to show this.  *Id.*  As a result, KetoNatural alleges that statements that make any of these four points are "literally false" under establishment claim doctrine because the studies either "d[o] not establish the proposition for which they were cited," or they "[a]re not sufficiently reliable to permit [the] conclusion" for which they are cited.  *Castrol, Inc.*, 977 F.2d at 63.

Hill's' marketing model targets veterinarians.  *C.f. Haugen*, 222 F.3d at 1274 (noting that one element in determining whether speech is "commercial advertising or promotion" under the Lanham Act is whether it was disseminated to the "relevant purchasing public").

Hill's counters that these materials are purely educational and informational and should not be treated as commercial speech.  *See Bolger*, 463 U.S. at 68 ("A company has the full panoply of protections available to its direct comments on public issues . . . . ").  But educational or informational speech can become commercial when disseminated to promote the purchase of goods, as was alleged here.  *See id.* at 67–68 (dismissing the same argument about pamphlets discussing venereal disease and family planning).[13]  The commercial speech inquiry is fact intensive, and viewing the allegations in the complaint holistically, we cannot categorically conclude that Hill's' statements are protected educational speech.

---

[13] *See also Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 62–65 (D.D.C. 1998), *amended*, 36 F. Supp. 2d 16 (D.D.C. 1999), and *appeal dismissed, judgment vacated in part sub nom. Washington Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000), and *amended*, 36 F. Supp. 2d 418 (D.D.C. 1999), and *appeal dismissed, judgment vacated in part sub nom. Washington Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000) (concluding that peer-reviewed journal articles and medical textbook reprints disseminated by a manufacturer to physicians promoting off-label drug uses were commercial speech); *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1544–45 (S.D.N.Y. 1994) (concluding that a comparative survey of science journals disseminated to a targeted audience of librarians that promoted defendant's journals was commercial speech); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 458–63 (D.N.J. 2009) (concluding that a selected article disseminated to physicians favoring defendant's x-ray contrast media was commercial speech).

"[B]ecause this information is in fact supplied by [Hill's], and because the primary purpose for supplying the information is to encourage the purchase of [Hill's'] featured product, the court must conclude that the speech is 'entitled to the qualified but nonetheless substantial protection accorded to commercial speech.'" *Washington Legal*, 13 F. Supp. 2d at 65 (quoting *Bolger*, 463 U.S. at 68).

We conclude that KetoNatural has plausibly alleged that Hill's has disseminated commercial speech through its educational materials for veterinarians.

The materials also satisfy the establishment claim doctrine. For example, a statement discussed earlier: under the slide title, "Premium Priced . . . may not be premium quality," the slide states "Diet-induced cardiomyopathy reported since 2017 in dogs fed 'premium' grain-free and boutique foods." App. 106. It implicitly relies on verifiable incidence data showing that BEG diets are correlated with the canine heart disease spike, and it satisfies the doctrine because KetoNatural alleges that no such data exists. KetoNatural alleges that the only thing close to incidence data are the reports to the FDA, and those were allegedly cherry-picked and manipulated by Hill's and other complainants.

In sum, KetoNatural has plausibly alleged that these educational statements, as well as statements on Hill's' webpages and hyperlinked pages, are actionable commercial speech.

### 2. *Speech of the Veterinarians*

KetoNatural also alleges that Hill's is vicariously liable for the Lanham Act violations of the alleged co-conspirator veterinarians. It alleges that these

23

veterinarians violated the Lanham Act by disparaging its products in (1) public media statements following the FDA investigation and blog posts describing their research, (2) academic articles, and (3) a Facebook page and spinoff website, all by warning about the link between BEG diets and canine heart disease.[14]

Hill's charges that these challenged categories of statements do not constitute actionable commercial speech because they do not share two of the *Bolger* characteristics for non-core commercial speech: they are not advertisements and do not reference a specific product.  We agree.

### a.    *Veterinarians' Public Media Statements and Blog Posts*

KetoNatural has not plausibly alleged that the veterinarians' public media and blog post statements are commercial speech.  Rather, these statements are First-Amendment-protected statements on matters of public concern.

The complaint alleges, as a sample:

- In an NBC News article, *"It's Not Going Away": Vets Still Seeing Cases of Dog Heart Problems Linked to Grain-Free Food*, a veterinarian provided quotes including, "[t]here are most likely other pathways to heart damage in dogs consuming BEG diets."  App. 70.

- A veterinarian wrote in her blog that a "recent increase in heart disease in dogs eating certain types of diets [*i.e.*, BEG diets] may shed light on the role of diet in causing heart disease."  App. 71–72.

- And again: "[Diet-associated DCM] can improve significantly when the diet is changed."  App. 75.

---

[14] The district court construed KetoNatural's complaint to also allege that Hill's is vicariously liable for unaffiliated veterinarians' disparaging speech.  To the extent that KetoNatural did allege this, we address it last.

- And again, in an article titled "*Diet-Associated Dilated Cardiomyopathy: The Cause is Not Yet Known But It Hasn't Gone Away*": a veterinarian wrote, "[m]ost dogs with diet-associated DCM have been eating non-traditional [BEG] diets for over one year."  App. 75, 77.

These statements and similar ones perhaps implicitly disparage BEG pet food, but in context they are too remote to be treated as commercial speech promoting Hill's' products.

First, the statements in the veterinarians' articles and blogs, without more, do not function to promote or advertise Hill's' products.  Like we noted above when discussing Hill's' statements, none of these present themselves as a "classic advertising campaign."  *Haugen*, 222 F.3d at 1274.  But unlike Hill's' statements, the veterinarians' statements are too attenuated from Hill's to reflect *Bolger*'s remaining characteristics of non-core commercial speech.

Neither do the statements meet the second *Bolger* characteristic: that they promote Hill's' products or brand.  The excerpts do not plausibly promote Hill's' brand because they are untethered from Hill's: Hill's is not the speaker, nor do the excerpts mention Hill's.  The speaker matters.  The speaker provides context to the consumer that the speech may be commercial.  And unlike the unique market position of Hill's and that of the contraceptive manufacturer in *Bolger*, who both occupied "sufficient control of the market," such that they "may be able to promote the product without reference to [their own] brand names," the veterinarians do not occupy the same position.  *See Bolger*, 463 U.S. at 66 n.13.  No similar context bridges the inferential gap tying their speech disparaging BEG foods to speech promoting Hill's'

25

products.  *See id.*; *see also Tobinick*, 848 F.3d at 950–51 (concluding that defendant's articles criticizing plaintiff doctor's dubious medical treatments were not commercial speech in part because they did not mention defendant doctor's medical practice or services).

Finally, KetoNatural does not plausibly allege that the veterinarians made these statements with economic motivation.  Even granting that the named veterinarians conspired with Hill's to disparage BEG dog food, KetoNatural does not plead sufficient factual allegations that the veterinarians made these statements in direct expectation of pecuniary gain from Hill's.  *See Ariix*, 985 F.3d at 1116 (explaining that the third *Bolger* factor "asks whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation."); *Amway*, 242 F.3d at 552–53 ("The question whether an economic motive existed is more than a question whether there was an economic incentive for the speaker to make the speech; the *Bolger* test also requires that the speaker acted *substantially* out of economic motivation.").

KetoNatural has alleged merely that the veterinarians received research funding from Hill's, either directly or indirectly through their universities.  It did not allege that research funding was contingent on the statements made in these blogs and social media appearances, nor did it allege that the research funding depended on the topic or result of the research itself.  *Cf. Ariix*, 985 F.3d at 1117–18 (finding that plaintiff plausibly alleged that the supplement guide was economically motivated to rig ratings because it pleaded facts of a hidden marketing arrangement between the

26

guide and the preferred company).  For a court to infer that the veterinarians' speech was economically motivated, KetoNatural must at least plead facts that the veterinarians were compensated or otherwise received a quid pro quo from Hill's for their speaking and writing.[15]  But KetoNatural failed to do so.  Simply put, the economic motive KetoNatural urges is too attenuated from Hill's and its products to render the veterinarians' speech commercial.

Because "Congress did not wish to extend federal Lanham Act liability to speech that is subject to broader general First Amendment protection than is commercial speech," no liability lies.  *Boule v. Hutton*, 328 F.3d 84, 95 (2d Cir. 2003) (Calabresi, J., concurring).  The district court correctly dismissed KetoNatural's claim for this category of statements.

### b.    *Veterinarians' Academic Articles*

KetoNatural also fails to plausibly allege that the veterinarians' academic articles are commercial speech.  The district court correctly recognized that as a general matter, scientific articles do not include actionable commercial speech. *See, e.g.*, *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 246–48 (3d Cir. 2023) (discussing that scientific conclusions are like opinions and thus not actionable speech); *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 534

---

[15] The complaint alleges that one veterinarian, Dr. Freeman, gave sponsored lectures for Hill's, but it does not allege that those sponsored lectures included speech disparaging BEG diets or that compensation was contingent on her speaking on that topic.

27

(1st Cir. 2023) (recognizing the force of this principle). "[T]o the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of false advertising under the Lanham Act." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013) (holding that scientific conclusions of this kind are non-actionable opinions). KetoNatural's allegations of false statements within these academic articles fall squarely within this accepted rule. We affirm the district court's dismissal of KetoNatural's claim with respect to this category of challenged speech.

### c.    *The Facebook Page and Website*

KetoNatural has likewise failed to plausibly allege that the Facebook page and associated website engaged in commercial speech.

KetoNatural alleged that Hill's and veterinarians started a Facebook page that, at the time of suit, was titled, "Diet-Associated Dilated Cardiomyopathy (DCM) in Dogs." And it alleged that the moderators of the Facebook page started a spinoff website publishing similar speech. Along with deleting comments that were "contrary to the science" that the page held as tenets,[16] the Facebook page disseminated the following speech:

---

[16] The act of deleting posts is editorializing, which is speech, and thus arguably commercial speech. *C.f. Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024) (stating that when social media platforms "decide which third-party content those

- "[W]e only know what broad diet types have been associated with the disease: those that are high in pulse legumes, such as peas and lentils, those that are grain-free, those that are produced by small manufacturers with heavier focus on marketing than research."  App. 111.

- "What we know so far is that disease [DCM] is disproportionately associated with grain-free diets or diets high in pulse legumes, such as peas or lentils, particularly when made by manufacturers with a small market share."  App. 112.

Additionally, the moderators of the DCM Facebook group published similar speech on the public-facing website:

- "DCM is caused by boutique brands, exotic proteins, or grain-free or a combination thereof . . . ."  App. 116.

- And again, "[t]he FDA has identified a worrying correlation between grain-free diets and dilated cardiomyopathy."  App. 115.

Similar to the analysis of the veterinarians' public media statements and blog posts, the Facebook page and associated website's statements are too attenuated from Hill's to be understood as commercial speech.  Facially, the statements are not advertisements.  Nor do they promote a specific product or brand.  Even if the statements do disparage BEG dog foods, a consumer would not interpret them to promote Hill's' dog food.  *See Tobinick*, 848 F.3d at 951 (explaining that restaurant reviews, product reports and the like are not commercial speech until used by an owner to promote his own goods or services).  Lastly, we do not know who the Facebook moderators are, and most importantly, how they participated in and were

---

feeds will display, or how the display will be ordered and organized, they are making expressive choices").

economically motivated by the alleged conspiracy. KetoNatural admitted as much. It alleged only that the moderators "work[ed] closely" with a veterinarian—but did not otherwise allege involvement in the conspiracy. App. 111. Without more, KetoNatural has not plausibly alleged that this category of statements includes commercial speech.

### d.    Veterinarians' Statements to Pet Owners

Finally, in its complaint, KetoNatural implies that several non-affiliated veterinarians educated by Hill's' efforts propagated the connection between canine heart disease and BEG diets. But there is no plausible allegation that any of these veterinarians' statements promoted Hill's' brand or were economically motivated. To the extent that KetoNatural alleged that Hill's is vicariously liable for the statements of non-affiliated veterinarians, we affirm the district court's dismissal of this claim.

### 3.    The Non-Profits

The same analysis applies to the speech of the non-profits. The complaint does not plausibly allege that the Morris Animal Foundation or the Mark Morris Institute engaged in commercial speech for Lanham Act purposes.[17] For example, it alleges that the Morris Animal Foundation

---

[17] The complaint does not allege any specific commercial speech disseminated by the Mark Morris Institute in its veterinary education materials. Thus, we affirm the district court's conclusion that KetoNatural failed to plausibly allege commercial speech by the Institute.

- posted information on its website about "diet associated DCM," and quotes a veterinarian saying, "[h]ome-cooked diets have been implicated in this problem, as well as small batch, boutique dog foods." App. 78–79.

Repeating the same *Bolger* analysis applied to the veterinarians, this speech is facially not an advertisement, and it does not reference a specific product or brand. *See Bolger*, 463 U.S. at 66–67. Nor does KetoNatural allege that the Foundation spoke motivated by direct economic gain from Hill's. *See id.* Allegations that Hill's funds the Foundation and influences its executive decisions cannot satisfy the quid pro quo necessary to successfully allege that Hill's' gains economically motivated the Foundation to make such statements. KetoNatural has failed to allege that the non-profits engaged in commercial speech promoting Hill's' pet food.

\*   \*   \*

In sum, KetoNatural has plausibly alleged under Rule 12(b)(6) that Hill's has engaged in commercial speech, and that each actionable speech category includes literally false statements. Thus, we affirm the district court's dismissal regarding non-actionable speech categories and reverse as to the remaining categories. We remand to the district court to determine two issues: (1) whether Rule 9(b) or 12(b)(6) applies to Lanham Act claims, and (2) whether KetoNatural has successfully pleaded a Lanham Act claim under the appropriate pleading standard.[18]

---

[18] The district court passed on deciding whether to apply the particularity pleading standard for a Lanham Act claim under Rule 9. Because we conclude that KetoNatural survives dismissal under Rule 12(b)(6), the appropriate pleading standard is once again relevant. We remand the question of the appropriate standard to the district court for it to decide in the first instance.

### C.    *Kansas Civil Conspiracy*

KetoNatural also sued Hill's for civil conspiracy under Kansas law.  Hill's contends that a Lanham Act violation cannot serve as the predicate violation of law required for a civil conspiracy claim.  *See Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984) (explaining that "[c]onspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy").

We need not resolve this question.  The district court dismissed the civil conspiracy claim because it dismissed the underlying Lanham Act claim, but we reverse and remand the Lanham claim respecting Hill's' statements.  And because we remand on the Lanham Act claim, we must also remand on the contingent Kansas civil conspiracy claim.  *SEC v. Cochran*, 214 F.3d 1261, 1267 (10th Cir. 2000) ("As a general rule . . . we do not consider issues not passed on below, and it is appropriate to remand the case to the district court to first address an issue.").  We remand to the district court to determine the appropriate pleading standard, whether Hill's' alleged Lanham violation can serve as a predicate violation for civil conspiracy, and whether KetoNatural has sufficiently alleged the remaining elements.

## III.   Conclusion

For the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.